UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MIRROR LAKE VILLAGE,** *et al.*, <br><br>      **Plaintiffs,** <br><br>v. <br><br>**KIRSTJEN NIELSON,** Secretary of the United States Department of Homeland Security, *et al.*, <br><br>      **Defendants.** | Civil Action No. 16-1955 (TFH) |

## MEMORANDUM OPINION

The plaintiffs in this suit are Mirror Lake Village, LLC ("Mirror Lake"), a company formed to develop a senior living community in Washington state, and seven Chinese nationals who invested $500,000 each in Mirror Lake (the "plaintiff-investors"). They are challenging the United States Citizenship and Immigration Services' ("USCIS") denial of the plaintiff-investors' I-526 petitions for visas under the "EB-5" immigrant investor program, which provides visas for individuals who make qualifying investments in American companies. The main issue before the Court is whether USCIS acted in an arbitrary and capricious manner by denying the plaintiff-investors' visas on the grounds that their investments in Mirror Lake were not "at risk" as required by the applicable regulations. The parties have filed cross motions for summary judgment. [ECF Nos. 18 and 21].

I. **Regulatory Background**

The Immigration and Naturalization Act ("INA") authorizes USCIS to issue visas to "qualified immigrants seeking to enter the United States for the purpose of engaging in a new

1

commercial enterprise . . . in which such alien has invested . . . capital." 8 U.S.C. § 1153(b)(5)(A). In order to qualify for visas under the "EB-5 program," as it is known, the investments must meet specific, employment-focused criteria. They must create "full-time employment for not fewer than 10 United States citizens" or other legal immigrants. *Id.* at § 1153(b)(5)(A)(ii). For investments in "targeted employment areas"—rural areas or those with high unemployment—the investments must be at least $500,000. *Id.* at § 1153(b)(5)(B)(ii); 8 C.F.R. § 204.6(f)(2).

Although the statute does not define the term "invest," implementing regulations clarify that to "invest" means "to contribute capital." 8 C.F.R. § 204.6(e); *see also* 8 U.S.C. §§ 1103(a)(1); (a)(3) (charging the Secretary of Homeland Security with the "administration and enforcement" of the INA, and giving him or her the authority to issue regulations "as he [or she] deems necessary for carrying out his [or her] authority" under the INA). According to the regulations, these contributions of capital must not be in the form of debts. *See* 8 C.F.R. § 204.6(e) ("A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital . . . ."). Investors must demonstrate that they have "placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk." 8 C.F.R. § 204.6(j)(2).

In addition to the regulations, *Matter of Izummi*, a 1998 decision by the Board of Immigration Appeals ("BIA"), provides further guidance on the agency's requirement that investments be "at risk." *Matter of Izummi*, 22 I. & N. Dec. 169 (BIA 1998). In *Matter of Izummi*, the agency upheld the denial of a Form I-526 petition because, *inter alia*, the petitioner's investment included a put option that allowed the investor to force the company to buy his

investment back at the original price, discounted by the amount the company had already repaid the investor. *Matter of Izummi* found that the investment could not "be considered to have been properly 'invested'" and was "not at risk" because "the petitioner . . . entered into an agreement to pay $290,000 in exchange for a promise that he can receive the $290,000 back six months later." *Izummi*, 22 I. & N. Dec. at 188. Because the Department of Homeland Security has designated *Matter of Izummi* as a precedential opinion, it "serve[s] as precedent[] in all proceedings involving the same issue(s)" and, except if modified or overruled by later precedential decisions, is "binding" on the agency. 8 C.F.R. § 103.3(c).

II. **Factual Background**

   a. **The Investments in Mirror Lake**

According to Mirror Lake's Limited Liability Company Operating Agreement (hereinafter "the Agreement"), which outlines the terms of the plaintiffs' investments in the company, the seven plaintiff-investors—Yanxue Deng, Hui Ge, Lei Hu, Ge Li, Zhichun Li, Ying Su, and Yue Wang, each invested $500,000 in Mirror Lake. J.A. at 18. Despite their equal investments, they received different percentages of interests in the company, ranging from .5% to 3%. *Id.* The investors each have the right to exercise a put option allowing them to force the company to buy back their interests at the purchase price. The Agreement sets forth the put option as follows:

> At the expiration of the At Risk Period[1] applicable to a Class A Member, the Company shall provide the Class A Member with a one-time right and option to compel the Company to purchase, subject to the Company having sufficient Available Cash Flow (excluding capital contributed by Members), all or any portion of such Class A Member's Interest at the purchase price thereof (e.g., the Capital Contribution made in respect of such Interest).

---

[1] According to the Agreement, the "At Risk Period" is defined as "the period of [a] Class A Member's conditional residency under the EB-5 Program." J.A. at 5. The plaintiff-investors are all Class A members. *Id.* at 18.

3

J.A. at 12. The Agreement defines "Available Cash Flow" as "the total cash available to the Company from all sources less the Company's total cash uses before payment of debt service." *Id.* at 5.

Alongside the Agreement, Mirror Lake's Confidential Offering Memorandum repeats the details of the put option and emphasizes the risks associated with the investment, including the risk that the company does not acquire sufficient financing and the risk that the plaintiff-investors do not receive equity in proportion to their investments. *Id.* at 24. The Offering Memorandum also states that "[t]here can be no guarantee of the return of invested capital to any EB-5 Member." *Id.*

### b. The I-526 Petitions and Denials

The plaintiff-investors filed I-526 petitions in October and November of 2014. Compl. ¶ 79. USCIS issued Notices of Intent to Deny ("NOIDs") each petition in December of 2015. *Id.* ¶ 81. The plaintiffs responded to the NOIDs in January of 2016, *id.* ¶ 86, and USCIS denied all seven of the petitions in February of 2016, *id.* ¶ 91. The plaintiff-investors then filed "Motions to Reopen and Reconsider a Denied Form I-526" in March of 2016. *Id.* ¶ 98. USCIS denied six of the motions in May and June of 2016. *Id.* ¶ 104. Because the parties have asserted that the petitions and denials were virtually identical, and have only filed the record associated with the adjudication of Lei Hu's petition, the Court treats that record as representative of the other adjudications. Defs.' Mot. for Summ. J. at 5 [ECF No. 18]; Pls.' Mot. for Summ. J. at 4-11 [ECF No. 21].[2]

---

[2] Zhichun Li's Motion to Reopen and Reconsider a Denied Form I-526 remained unadjudicated at the time the plaintiffs filed their complaint. Compl. ¶ 104; *see also* Pls.' Mot. for Summ. J. at 11. As a result, the Court shall order plaintiffs to show cause why the Court should not dismiss Zhichun Li's complaint without prejudice. *See Clifton Power Corp. v. FERC*, 294 F.3d 108, 110 (D.C. Cir. 2002) ("Our cases make clear that a petition seeking review of . . . a non-final [agency] action is not only premature but

4

In its Notice of Intent to Deny plaintiff Lei Hu's petition, USCIS concluded that the record did "not demonstrate that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the investment." J.A. at 54. Citing *Matter of Izummi*, USCIS noted that "[f]or the alien's money truly to be at risk, the alien cannot enter into a partnership knowing that he already has a willing buyer in a certain number of years, nor can he be assured that he will receive a certain price." *Id.* at 55. UCSIS did not mention the Agreement's condition that the company have available cash flow in order for the plaintiff-investors to exercise their put option.

In her response to the agency's NOID, Lei Hu pointed to the Agreement and the Offering Memorandum and emphasized that the "right of investors to exercise the Put Option . . . is ***expressly contingent*** upon the availability of cash flow." J.A. at 59 (emphasis in original). She also emphasized that she exchanged capital for a 2% ownership interest in the company—the "hallmark of an equity investment, not of debt." *Id.* at 64.

In its February 2016 denial of Lei Hu's petition, USCIS characterized the plaintiff-investors' position that the put option is contingent upon available cash flow as "arguing that her capital is at risk only insofar as [Mirror Lake] is not profitable," and noted that, if Mirror Lake is "profitable and ha[s] sufficient cash flow, the Put Option was clearly written as an exit strategy for the investor to compel [Mirror Lake] to purchase the member's interest." *Id.* at 70. USCIS concluded that, because the petitioner's investment was made in exchange for a redemption agreement, it was not "invested" and was not "at risk." *Id.*

---

incurably so: 'subsequent action by the agency on a motion for reconsideration does not ripen the petition for review . . . .'") (*quoting United Transp. Union v. ICC*, 871 F.2d 1114, 1116 (D.C. Cir. 1989).

5

In Lei Hu's Motion to Reopen and Reconsider a Denied Form I-526, filed on March 14, 2016, she again argued that her investment was not a debt arrangement because "Petitioner has no guarantee that her interest will be purchased by [Mirror Lake] in a certain number of years or at a certain price." J.A. at 74. She also emphasized that because a company can control its available cash flow, even if Mirror Lake became profitable, she might not be able to exercise her option. *Id.* at 82. Lei Hu also submitted evidence to support her motion. She included charts of U.S. Department of State visa processing times to demonstrate that she would need to "maintain her investment . . . for nearly a decade" due to long visa processing times. *Id.* at 76-80. She also cited statistics on the high failure rates of new businesses to demonstrate the risky nature of her investment. *Id.* at 81-82. Finally, she attached a letter from a certified public accountant stating that Mirror Lake recognized petitioner's investment as an increase in equity, not a liability. *Id.* at 83; 85-86.

In its final denial of her motion, USCIS found that "despite the new evidence and arguments presented" regarding the survival rates of new businesses and visa processing times, Lei Hu still "neglect[ed] to contemplate [Mirror Lake's] potential success and consequent obligation to return the capital to the petitioner on demand." J.A. at 91.

### III. Legal Standard

The plaintiffs challenge the denial of their visa applications under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*. "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Chiayu Chang v. USCIS,* 289 F. Supp. 3d 177, 182 (D.D.C. 2018) (internal quotations omitted). When considering challenges to agency action under the APA, instead of applying Federal Rule of Civil Procedure 56(a)'s summary judgment

standard, "the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotations omitted).

The APA requires courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow, and a court is not to substitute its judgment for that of the agency." *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**IV. Discussion**

   **a. *Matter of Izummi*'s Interpretation of the Regulations is Entitled to Substantial Deference**

The plaintiffs first challenge the validity of *Matter of Izummi*, arguing that it exceeds the bounds of the EB-5 statute and implementing regulations by requiring that investments be "indefinite" in order to qualify for the EB-5 program. Pls.' Mot. for Summ. J. at 35. According to the plaintiffs, *Matter of Izummi* "purports to create a requirement for an EB-5 investment that simply does not exist in the statute or regulations, and in fact contradicts the timing component of the regulations and current, published USCIS policy." *Id.* at 41.

*Matter of Izummi* found that an investment agreement allowing the investor to exercise a put option at a set price and time did not satisfy 8 C.F.R. § 204.6's requirement that investments be "at risk." *Izummi*, 22 I. & N. Dec. at 183. The agency emphasized that it did "not find that an alien investor may never sell back his partnership interest," but instead require[d] that "prior to completing all his cash payments under a promissory note . . . an alien investor may not enter into any agreement granting him the right to sell his interest back to the partnership." *Id.* at 186. In this way, *Matter of Izummi* focused on the intent of investors signing investment agreements.

7

*See id.* ("To enter into a redemption agreement at the time of making an 'investment' evidences a preconceived intent to unburden oneself of the investment as soon as possible after unconditional permanent resident status is attained.").

*Matter of Izummi's* interpretation does not conflict with the EB-5 statute. The EB-5 statute does not address the structure investments must have to qualify for the visa program, or the length of time that investments must be maintained. *See* 8 U.S.C. § 1153(b)(5) (requiring only that the investments create full-time employment for at least 10 United States citizens, and that the investments in targeted employment areas be a minimum of $500,000). The statute's failure to address the structure of investments "simply means that there is a gap for the agency to fill," which the agency has done via regulations and *Matter of Izummi*'s interpretation of those regulations. *Visinscaia v. Beers*, 4 F. Supp. 3d 126, 135 (D.D.C. 2013).

"When reviewing an agency's interpretation of its own regulation, [courts] accord 'substantial deference to the agency's interpretation,' giving it 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Mellow Partners v. Comm'r of Internal Revenue Serv.*, 890 F.3d 1070, 1079 (D.C. Cir. 2018) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *accord Auer v. Robbins*, 519 U.S. 452, 461 (1997). Courts generally apply this level of deference—commonly known as *Auer* deference—when the following three factors are satisfied: 1) the language of the regulation in question is "ambiguous"; 2) there is "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question"; and 3) "the agency's reading of its regulation [is] fairly supported by the text of the regulation itself, so as to ensure that adequate notice of that interpretation is contained within the rule itself." *Mellow Partners*, 890 F.3d at 1070 (internal quotations omitted).

Because all three *Auer* factors are met, the Court will apply substantial deference to *Matter of Izummi*'s interpretation of 8 C.F.R. § 204.6. As to the first *Auer* factor, the regulation is ambiguous as to whether an investment agreement with a put option qualifies as an at-risk contribution of capital. The regulation's catchall phrase "or any other debt agreement" provides the agency room to interpret which investment agreements constitute debt arrangements aside from those explicitly listed in the regulation. *See* 8 C.F.R. § 204.6(e) ("A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the commercial enterprise does not constitute a contribution of capital for the purposes of this part.").

Relatedly, as to the third *Auer* factor, *Matter of Izummi*'s conclusion that the redemption agreement made the investments "debt arrangements" is supported by the text of the regulation, which contemplates that the agency will make determinations about debt arrangements that are not specifically listed. *See Mellow Partners*, 890 F.3d at 1080 (internal quotations omitted) (finding that a "catchall" phrase in the regulation "expressly contemplate[d] its application beyond the specific enumerated forms" and satisfied the third *Auer* factor); *Chiayu Chang*, 289 F. Supp. 3d at 185 (commenting that the phrase "or any other debt arrangement" in 8 C.F.R. § 204(e) "ensures that a broad set of arrangements similar to the listed examples will be prohibited"). Moreover, although the regulations require that an investor "continuously maintain[] his or her capital investment over the two years of conditional residence," *Matter of Izummi* does not prevent investors from selling their investments after the end of the two-year period, or create requirements that extend beyond that period. 8 C.F.R. § 216.6(c)(1)(iii).[3]

---

[3] For the same reason, *Matter of Izummi* does not contradict the section of the USCIS Policy Manual cited by the plaintiffs, which provides that investors demonstrate that they sustained their investments throughout the conditional residence period. USCIS Policy Manual, Volume 6, Part G, Ch. 5, § A(2).

9

The second *Auer* factor is also satisfied because the Court has no reason to conclude that the agency's interpretation in *Matter of Izummi* does not constitute its "fair and considered judgment on the matter." *Mellow Partners*, 890 F.3d at 1080 (internal quotations omitted). There is no evidence that the agency has waivered from its interpretation of *Matter of Izummi. Id.*; *see, e.g., R.L. Inv. Ltd. Partners v. INS*, 86 F. Supp. 2d 1014, 1023 (D. Haw. 2000) (hereinafter "*R.L.I.L.P.*") (declining to disturb *Matter of Izummi's* interpretation that "for purposes of meeting the statutory and regulatory definition of 'invest' (or 'contribution of capital'), an alien may not enter into an agreement before the end of his two-year conditional residence period that grants him the right to sell his interest back to the partnership.").

*Matter of Izummi* does not require that investments continue beyond the two-year, conditional residence period. It requires that when investors sign investment agreements, they do not have a guaranteed way to trigger their own exit from their investments. There is no indication that a different interpretation of the regulations is "compelled by the regulation's plain language or by other indications of the agency's intent at the time of the regulation's promulgation." *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1085-86 (D.C. Cir. 2015) (internal quotations omitted). Accordingly, the Court defers to *Matter of Izummi*'s interpretation of 8 C.F.R. § 204.6.

The plaintiffs argue that prohibiting investors from exiting their investments can cause companies to fraud investors and "misuse" the investments for "purposes that are not in the interests of the investors." Pls.' Mot. for Summ. J. at 41. They also argue that, because some businesses may become operational and self-sustaining after the conditional residence period ends, it "makes little sense" to require investors to maintain their investments in businesses that do not need that capital. *Id.* at 40.

10

Of course, *Matter of Izummi* does not prevent investors from selling their stake in a company after the conditional period expires. It prevents them from arranging such a sale with a company when they invest. More importantly, "[t]he [C]ourt is not the arbiter of immigration policy." *R.L.I.L.P.*, 86 F.Supp.2d at 1022. The agency has determined that investors are more inclined to help companies succeed when they know the returns on their investments are uncertain. Defs.' Mot. for Summ. J. at 15; *see R.L.I.L.P.*, 86 F. Supp. 2d at 1024 (finding that the agency's definition of risk "rationally advances the job-creation purposes of the statute" because "[i]f the alien has placed his money fully at risk with no expectation of reimbursement, he is more likely to be involved in the enterprise . . . and his entrepreneurial talents are more likely to be brought to bear on advancing the enterprise's success, with the concomitant creation of jobs that Congress envisioned."). This definition of risk rationally advances the statute's job-creation purpose. It is not the Court's "task . . . to decide which among several competing interpretations best serves the regulatory purpose." *Thomas Jefferson Univ.*, 512 U.S. at 512; *see also Decker v. Northwest Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) ("It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail.").

### b. USCIS's Decisions were not Arbitrary and Capricious

#### i. USCIS's Decisions are Entitled to Deference

The plaintiffs argue that the agency's decisions should not receive any deference because the agency has "no particular expertise in interpreting investment agreements or determining what constitutes a debt arrangement." Pls.' Reply at 10 [ECF No. 26]. The government counters that the plaintiffs are asking this Court to "engage in its own *de novo* analysis of the regulation," which is "the exact opposite of the deference this district court normally shows to agencies

11

interpreting their own regulations." Defs.' Opp'n at 7 [ECF No. 24]. They also contend that deference to agencies is not just a factor of expertise alone, but also a result of Congress' delegation of authority to administrative agencies and separation of powers principles. *Id.* at 8.

There are a handful of justifications for judicial deference to the decisions of executive agencies, including an agency's expertise. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1222 (2015) (Thomas, J., concurring) (listing different justifications cited for deference, including "agency expertise in administering technical statutory schemes," and Congress' "delega[tion] to agencies the authority to interpret their own regulations"[4]); *Thomas Jefferson Univ,* 512 U.S. at 504 (finding deference to administrative agencies "all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.") (internal quotations omitted). In the immigration context, deference is "especially appropriate" because "officials exercise especially sensitive political functions that implicate questions of foreign relations." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotations omitted).

Regardless of the justification for deference, the test for determining whether to defer to an agency decision is not, as the plaintiffs suggest, to determine whether the agency has the requisite expertise to make the decision.[5] Rather, when examining agency decisions, the Court

---

[4] Note, however, that Justice Thomas finds "none" of the justifications "persuasive." *Perez,* 135 S. Ct. at 1222.
[5] The only authorities the plaintiffs cite to support their proposition are inapposite. They pertain to instances where courts have declined to defer to agency interpretations of criminal statutes, not agency regulations. *See, e.g., Bobb v. Att'y Gen. of the United States,* 458 F.3d 213, 217 n.4 (3rd Cir. 2006) (declining to defer to the BIA's determination of whether a "particular federal criminal offense is an aggravated felony" because that determination required the court to "interpret federal criminal law and [the court's] own appellate jurisdiction, matters outside the authority or expertise of the BIA."); *Trung Thanh Hoang v. Holder,* 641 F.3d 1157, 1163-64 (9th Cir. 2011) ("While we defer to the BIA's

12

must ensure that an agency "examin[ed] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Even if a decision is based on an agency's "purported expertise," the Court must examine the logic behind the decision and ensure that an agency provides a "clear and coherent" explanation. *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006); *see Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (finding that "no deference is owed . . .where the agency's explanation for its action lacks any coherence." ) (internal quotations omitted).

### ii. USCIS Examined the Evidence and Satisfactorily Explained its Decisions

The plaintiffs contend that USCIS acted in an arbitrary and capricious manner when it did not evaluate "debt and equity factors" to determine the nature of their investment, such as the investment's lack of a fixed maturity date, investor voting rights, and Mirror Lake's debt to equity ratio. Pls.' Mot. for Summ. J. at 28 (citing *PepsiCo P.R., Inc. v. Comm'r of Internal Revenue*, 2012 WL 4207299, at *19 (U.S. Tax Ct. 2012) (applying a 13-factor framework to resolve "debt-versus-equity-inquiries"). According to the plaintiffs, the defendants "failed to consider whether the Put Option was an unconditional, contractual promise to repay investors regardless of the success or failure of the business, or an at-risk investment, subject to partial or total loss depending on business fortunes." Pls.' Opp'n at 7 [ECF No. 22]. In response, the defendants argue that the Court should not supplant the agency's interpretation merely by "identifying alternative findings that could be supported by substantial evidence." Defs.' Opp'n

---

definitions of ambiguous terms in the INA, we do not defer to the BIA's every conclusion that a particular crime is a removable offense.").

at 7 (internal quotations omitted). They contend that the agency's decision was rational and supported by the evidence before it.

USCIS's decision was not, as the defendants argue, "a lengthy explanation of how structurally the arrangement operates much like a debt arrangement." Defs.' Reply at 5 [ECF No. 23]. USCIS's total analysis of the investment spanned a few brief paragraphs and focused entirely on the put option. However, the agency conducted a satisfactory analysis of the risks the plaintiffs raised. After examining the put option provisions of the Agreement and Offering Memorandum, USCIS considered the plaintiff-investors' argument that their right to exercise the option was contingent on the availability of cash flow. The agency concluded that, despite that condition, the option was a debt arrangement because if Mirror Lake was "profitable and ha[d] sufficient cash flow, the Put Option was clearly written as an exit strategy for the investor to compel [Mirror Lake] to purchase the member's interest." J.A. at 70. Further, the agency considered the plaintiffs-investors' argument that Mirror Lake might not return the investment in light of high failure rates of new businesses, and concluded that it "neglects to contemplate [Mirror Lake's] potential success and consequent obligation to return the capital to the petitioner on demand." J.A. at 91; *see Izummi*, 22. I. & N. Dec. at 185 (finding that "[t]he risk that the petitioner might not receive payment if the Partnership fails is no different from the risk any business creditor incurs."). The agency also found that the plaintiff-investors' contention that the company has the discretion to control the availability of capital—and thus, whether it repays investors—would constitute an illusory promise that the agency does not recognize. *Id.*; *see Izummi*, 22. I. & N. Dec. at 185 (dismissing argument that option was dependent on partnership's ability and willingness to pay and concluding that it "cannot endorse illusory promises and does not recognize this type of 'risk' as the kind of risk contemplated by 8 C.F.R. § 204.6(j)(2)").

14

Given the structure of the put option, USCIS found "such relevant evidence as a reasonable mind might accept as adequate to support" the agency's finding that the plaintiffs' investments constituted a debt arrangement. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Pension Benefit Guaranty Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013) (internal citations omitted).

This case is notably distinct from two recent decisions in this district finding that USCIS acted in an arbitrary and capricious manner when it denied form I-526 petitions. *Doe v. USCIS*, 239 F. Supp. 3d 297, 299 (D.D.C. 2017); *Chiayu Chang*, 289 F. Supp. 3d at 182-188. In both cases, the investment agreements at issue included call options, not put options. Because those options were "owned by the partnership" and came with "no guarantee that the partnership would exercise it," both courts found that the agency failed to adequately consider the structure of the options when concluding that the investments were debt arrangements. *Chiayu Chang*, 289 F. Supp. 3d at 187; *see also id.* at 183 (finding that "[t]he evidence before the agency indicated that the call option [did] not provide plaintiffs with a guaranteed redemption, and that it differ[ed] in critical ways from the debt arrangements that *Matter of Izummi* determined were banned by regulations."); *Doe*, 239 F. Supp. 3d at 306 (finding that the record before the agency made clear that the "Plaintiffs were not guaranteed to receive *any* of their capital contributions back, let alone make any return on their investments.") (emphasis in original). In contrast to the call options, *Matter of Izummi*'s put option "insulated the petitioner's capital from risk because it provided the petitioner with a right to receive its capital back at a set price." *Doe*, 239 F. Supp. 3d at 307; *see also Chiayu Chang*, 289 F. Supp. 3d at 178 (contrasting *Doe* and *Chiayu Chang's* call options with *Matter of Izummi*'s put option). The plaintiffs here emphasize throughout their briefing that because the option in their Agreement is more conditional than the option in *Matter*

15

*of Izummi*, USCIS's decision was arbitrary and capricious. They have not demonstrated, as the plaintiffs did in *Doe* and *Chiayu Chang*, that the agency's decision was contrary to the evidence before it. Instead, they ask the Court to insert its judgment for the agency's in determining the extent of risk involved in the investment. The Court declines to do so.

As to the plaintiffs' claim that the agency did not consider "debt and equity factors," the plaintiffs cite no regulatory or statutory authority requiring the agency to consider the factors they list. *See Akpan v. Cissna*, 288 F. Supp. 3d 155, 164 (D.D.C. 2018) (finding that an agency's failure to review factors presented by plaintiff did not make the decision arbitrary and capricious where no statutory or regulatory authority required the agency to consider those factors). In fact, *Matter of Izummi* determined that apparently similar factors were not relevant to determining whether an agreement qualifies as a debt arrangement. The agency considered a 1997 opinion from its Office of General Council which "engaged in a lengthy discussion of the factors evidencing debt and equity in the context of tax law," and found that "[a] discussion of the numerous debt and equity factors set forth in the tax cases unnecessarily complicates the attempt to ascertain the true substance of the transaction."[6] *Izummi*, 22. I. & N. Dec. at 184. The agency also noted that "the businesses examined in [the tax cases cited by the Office of General Council] were standard businesses not created for the purpose of enabling aliens to obtain immigration benefits." *Id.* at 184. Rather, *Matter of Izummi* found that "very simply," the investment at issued "constitute[d] a straight loan . . . . The risk that the petitioner might not receive payment if the Partnership fails is no different from the risk any business creditor incurs." *Id.* at 185. In light of *Matter of Izummi's* decision that debt and equity factors were not relevant to its determination of

---

[6] *Matter of Izummi* did not specifically list the factors.

16

the nature of the agreement, and USCIS's consideration of the structure of the put option, USCIS did not act in an arbitrary and capricious manner by failing to consider those factors here.

### c. USCIS did not Misconstrue *Matter of Izummi*

Finally, the plaintiffs emphasize that USCIS "unreasonably expanded and misconstrued" *Matter of Izummi*. Pls.' Mot. for Summ. J. at 22. They argue that *Matter of Izummi* did not "categorically prohibit" an investor to agree to sell his interest back to the company after the expiration of the conditional residence period, but rather prohibited such agreements only "prior to completing all his cash payments under a promissory note (whether to the partnership or to some third party-lender)." *Id.* at 22. Although it is true that USCIS left this language out of its decision, it is not clear why that is important to the adjudication of the plaintiffs' claims. They do not claim that they made their Agreement after they completed payment.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment [ECF No. 18] will be granted as to Mirror Lake and the six individual plaintiffs whose petitions were fully adjudicated at the time plaintiffs filed their complaint—Yanxue Deng, Hui Ge, Lei Hu, Ge Li, Ying Su and Yue Wang, and the plaintiffs' cross motion for summary judgment [ECF No. 21] will be denied as to those same plaintiffs. The Court will order plaintiffs to show cause why Zhichun Li's complaint should not be dismissed without prejudice. An appropriate order accompanies this opinion.

December 14, 2018

Thomas F. Hogan
SENIOR UNITED STATES DISTRICT JUDGE